Wanamaker, J.
This is a prosecution based on Section 13 of the Smith Cold Storage Act, as found in volume 107 Ohio Laws, page 594, which section reads:
“No person, firm or corporation shall sell, or offer, or expose for sale, any of the following foods which have been held for a longer period of time than herein specified in a cold storage warehouse: * * * dressed fowl, ten months * * *.”
Section 19 of that act provides:
“Whoever violates any of the provisions of this act shall be guilty of a misdemeanor and upon conviction thereof shall for the first offense be fined not more than five hundred dollars,” etc.
The constitutionality of the act, being the major question, will first be considered.
The Smith Cold Storage Act was under the consideration of this court very recently in Columbus Packing Co. v. State, ex rel. Schlesinger, ante, 285.
While neither the syllabus nor the opinion, in express language, passes upon the constitutionality of the act as a whole, nevertheless, by the clearest implication, the court must have had before it this • identical question, and, impliedly at least, recognized the proceeding pursuant to said act as a valid exercise of police power.
The importance, however, of the question, both to the state and the defendant, warrants a full consideration of this case as if it were presented for the first time.
It is conceded that the statute in question is one involving the police power of the state. It is con *459 tended, however, that the provision of the statute in question unconstitutionally invades the defendant’s constitutional rights.
The dimensions of the government’s police power are identical with the dimensions of the government’s duty to protect and promote the public welfare. The measure of police power must square with the measure of public necessity. The public need is the polestar for the enactment, interpretation and application of the law. If there appears in the phrasing of the law and the practical operation of the law a reasonable relation to the public need, its comfort, health, safety and protection, then such act is constitutional unless some express provision of the constitution be clearly violated in the operation of the act.
Moreover the growth of the police power must from time to tithe conform to the growth of our social, industrial and commercial life. You cannot put a strait-jacket on justice any more than you can put a strait-jacket on business. Private initiative, enterprise and public demand are constantly discovering and developing new methods and agencies, honest and dishonest, and the police power must be always available to afford apt and adequate protection to the public. ' The war has developed new conditions which we cannot ignore if we would, and which we should not ignore if we could. Not the least of these new conditions that now confront us is the unconscionable profiteering. The right of the government to regulate profiteering is centuries old. One of the earliest recognitions of it was no doubt that of limiting the amount *460 of interest charged, usury regulations, as they are called, expressly limiting the amount of profit the owner of capital might take when he loaned his money to others for investment purposes.
. There never has been any doubt about the power of government in this behalf. The power of government to likewise limit profit, when a party, instead of loaning the money, invests it on his own account, cannot upon'principle be disputed or denied. More millionaires by threefold have been made in this country in the last five years than in the prior twenty, though' that was an unusual period of general national prosperity. It is unconscionable that during a period of great public service, personal sacrifice, and general economy upon the part' of the people to meet the unusual and exacting demands of a great war, such exorbitant and incalculable fortunes should have been piled up by those who spell their patriotism with a “pay.”
Numerous legislative enactments, national and state, have been passed, one of the purposes of which has been to curtail these profits, prevent the cornering of fuel and food, and force them upon the market.
The act in question, it is reasonable to presume, had two legislative purposes, one pertaining to health and the other to hoarding. The first was to be promoted, the latter to be prevented. The act clearly has a pertinent relation to both. Both purposes are clearly within the constitutional right of the general assembly, and none of the provisions of the law is violative of any constitutional right of the defendant.
*461 The somewhat startling contention is made, however, that while it may not be the presence of any provision of the statute that renders the act unconstitutional, yet the absence of provision renders it unconstitutional as violative of property right: or, in the language of the plaintiff in error, as strenuously urged, “in the case at bar no provision -is made for the sale or disposition of the food products held in cold storage 'beyond a certain time limit. A sale is expressly inhibited.”
One of the primary purposes of this act is undoubtedly to force these goods upon the market within the time limit, not afterward. To make a provision for the sale of them after the law had been violated, in order tó reduce the loss to their owner, would only be to put a premium upon the violation. Laws are passed to enforce obedience and not disobedience of them; and the only limitation put upon their violation, known to the constitution, is that the punishments inflicted by way of penalty shall not be cruel or unusual.
We hold the Smith Cold Storage Law to be a valid and constitutional enactment.
As to the incompetent evidence urged by the defendant below; it will not be amiss to return to some of the fundamental facts and primary principles of evidence. The old-time question of Pontius Pilate “What is Truth?” .is still asked by thousands. Courts and juries are daily called upon to answer this same question touching many a controversy. Our jurisprudence has evolved through the centuries a system of rules and principles for the ascertainment of the truth concerning any disputed *462 question of fact, in which necessarily judicial rules have played a very large part. The old definition of Mr. Justice Blackstone recurs as one of the best: “Evidence signifies that which demonstrates, makes clear, or ascertains the truth of the very fact or point in issue, either on the one side or on the other.” (3 Black. Comm., 367.)
The paramount question involved in all these rules of evidence is to prevent falsehood and produce truth.
As was observed by Lord Ellenborough, in a celebrated English case: “The rules of evidence must expand according to the exigencies of society.”
In no department of our national life have there been greater expansion and progress than in the manner and method of conducting commercial transactions. Originally the business of the country was all done by the individual man. He was his own superintendent, manager, foreman, clerk, cashier, bookkeeper, receiving and disbursing agent, and performed in a small way all the functions now done by a great commercial corporation. He alone knew all the “ins and outs” of every business transaction he had with the public,' because he alone conducted the business. But, today it is otherwise. The corporation is largely doing the business of the country. It is made up of an innumerable variety of managers, foremen and clerks and employes, each having certain duties and functions to perform in connection with the common enterprise, and making and preserving a record of its business transactions.
*463 Courts of law and equity must know as judges what they know as men. Common, everyday experience must not be ignored to satisfy some merely technical rule, and the several rules of evidence must be so adjusted and adapted to our changing business and commercial life as the nature and the necessities of the case require for the safe and successful conduct of such business.
In the case at bar we have “check slips,” or “check cards,” which the testimony discloses were used in the regular course of business of the ice and storage company.
The witness for the state, J. S. Gibson, testified that he was the office manager, and he detailed as follows the regular course of business as to the receipts at the company warehouse:
“Well, upon delivery of a commodity such as we will receive to our platform, we issue a receipt to the party that delivers the goods and that receipt, by using carbon paper, we make two records, one for our office and one carbon copy on a card. That card becomes the record in the office, of that commodity in the plant. That is covered by a lot number. That gives them, the owner or the man who delivers the goods, a receipt for the product and gives us an exact carbon copy of the receipt given him, which is our permcment record.” (Italics ours.)
He further testified that a lot number was put upon the card, at the upper right-hand corner as a rule, and that that same lot number was put on the article itself for identification purposes.
State’s exhibit number two was identified by the *464 witness as “a storage record card,” and he testified that that card was made out by one S. A. Matthews.
S. A. Matthews subsequently testified that he was “house-superintendent” at the time in question. He testified in substance that “when a quantity of meats or other products were presented for storage, the goods were classified and the record made on the form which we have for each class of goods.”
He was then handed State’s exhibit number two> and asked to identify it, which he did. He said it was “a part of the record of receipts for storage.” The following questions were asked and answered:
“Q. State whether complete records of all receipts are kept in that manner? A. They are.
“Q. In this keeping of the record of receipts, state what is done, if anything, with reference to indicating the lot number for particular quantities of goods stored? A. On the records?
“Q. Yes. A. The lot number appears on the card, on the corner of the card.
“Q. And that is indicated on this exhibit by what figures? A. The red figures in the corner.
“Q. The red figures in the corner. You are referring to the figure 7155, are you? A. Yes, sir.
“Q. And state whether goods so entered under that number for storage, retain that lot number during the continuance of their storage in the warehouse? A. As far as I know they have.
“Q. Can you state who made this particular part of the record embodied on the cards? A. It was made by myself.”
*465 The witness further said as to the entire record:
“Q. State whether that record .made by you was made at the time of the transaction recorded. A. At the time of the receipt of the goods.
“Q. State whether this is the record made in the ordinary course of the business. A. It- is.
“Q. State what writing, if any, indicates who stored it. A. The name appearing at the top of the card.
“Q. Which is what? A. Leonard Poultry Company.”
There was other testimony touching state’s exhibit number two relating to the receipt of the poultry of The Leonard Poultry Company, which was in question in this case, but sufficient has been given to show that this exhibit was clearly competent as an original entry made in the regular course of business, a part of the res gestae of the receipt of the goods, and a declaration against the interest of the storage company.
The other chief exhibit in controversy is state’s exhibit number one, which deals with the delivery of the goods of The Leonard Poultry Company to the Elk’s Home. State’s exhibit number one was identified also by the same witness, as in the regular course of business, though there is not the same identification by any one witness of the storage company as to the endorsements on that exhibit. However, one August Beck, of the Elk’s Home, identified the exhibit by testifying to having seen it at the Elk’s Home, and having endorsed his initials “A. B.” upon it as a receipt for the goods *466 from The Leonard Poultry Company at the Elk’s Home on the date set forth on the card.
We are unanimously agreed that these card slips, as shown by the record, under the style of “state’s exhibits,” especially numbers one and two, are competent as evidence upon the whole record of the case; but we are not agreed as to the grounds upon which they are competent.
We are agreed that the statute known as The Smith Cold Storage Law having made special provision for the keeping of the records of the warehouse, showing receipts and redeliveries of the goods stored in said warehouse, such card checks or card slips are quasi-public records, and are therefore admissible to prove the transactions to which they relate, to-wit, the receipt and redelivery of the goods.
We are also unanimously agreed that whether or not the exhibits were duly qualified by the preliminary proof prior to their introduction, said exhibits were clearly made competent by the evidence of one John P. Brennan, an auditor of the agricultural department, who testified in substance that he had a talk with the defendant, Mr. Leonard, concerning the delivery to the Elk’s Home by The National Ice & Cold Storage Company, of the poultry in question.
Among other things he said:
“We saw the duplicate of invoices of the withdrawals of poultry from The National Ice & Storage Company, in accordance with our record, as we found them at The National Ice Company.
*467 “Q. Have you those duplicates which you saw at his office at that time ? A. Duplicates, no; He kept those duplicates, but he exhibited them to us. * * *
“A. [Witness] Do you want me to start from the beginning and go through?
“Q. Yes, do that, Mr. Brennan.
“A. When I called at his office [Mr. Leonard’s], he was there, and also a Mr. Engle — I think he is an employe of Mr. Leonard’s. I told him we had been instructed by the dairy and food commissioner, Mr. Galt, to call at his office and take over his book records of the sale of the fowl, as it was withdrawn from the National Ice. Mr. Leonard stated that he did not have a book record. I said, ‘Mr. Leonard, you certainly know where you sold this fowl,’ and showed him my record of what he had taken from The National Ice & Cold Storage Company plant. ‘Oh,’ he says, T haven’t any book record, but I have the duplicate invoices to the parties to whom it was sold.’ I said, ‘that is all that we ask for.’ He proceeded and gave us — showed us the duplicate slips, taken from his — they were wrapped up in small packages, possibly four by six, and each lot of invoices were kept separate by months. The first one called for was the month of April — I think there were four in April, and May and June, etc. It wasn’t a difficult matter for Mr. Leonard to locate those at all, and we located all of the duplicate invoices under Lot No. 7155, and as we went through, I said, ‘Mr. Leonard, what. did you do with this ?’ And he said, ‘That is the Elk’s Home,’ and ‘this was the *468 Elk’s Home/ and ‘this was Brownell/ and so on, as we went down the line. * * *
“Q _ State whether or not you called to his attention an item of one box of fowl, fifty-nine pounds, withdrawn on the twentieth of May, 1919. A. I did, yes, sir.”
There was other testimony in the record to the same general effect, but sufficient has been indicated to show the unmistakable competency of these exhibits.
The court is divided on the question as to whether or not the preliminary proof as to these exhibits was sufficient to make them competent wholly apart from the testimony of Brennan, because no witness directly or expressly testifies to the qualification quoted in Greenleaf, “provided he swears that he should not have made it if it were not true,” and as further suggested in Moots v. The State, 21 Ohio St., 653, that “the witness truly made the entries;” which word “truly” also appears in Shriedley v. The State, 23 Ohio St., 130.
Now, the witnesses were all under oath, and they testified as to the regular course of business, and as to their personal knowledge concerning the entire transaction, and especially the card slips. The card showing the receipt of the entry of the poultry in question, lot No. 7155, bore the personal endorsement of the witness Matthews. It matters not what other memoranda or data appeared on said card, save and except the number identifying the lot, and the receipt of the lot, both of which entries were made by Matthews in the regular course of business. His general oath, “to tell the *469 truth, the whole truth, and nothing but the truth,” adequately qualifies his testimony as to this preliminary proof, without a special reference, direct and positive, to the particular entries that he himself made touching the lot number and the date of the receipt of the poultry.
As to the other most important exhibit, “state’s exhibit one,” showing the redelivery of the poultry in question by the storage company to- the Elk’s Elome, the evidence of course does not disclose what clerk wrote out that receipt, which was signed by the Elk’s Home, by the chef or manager of that department of the home, August Beck, who was a witness under oath and identified the exhibit and his signature by his initials “A. B.,” together with the date of the receipt. s The formal data, made evidently by some clerk, in the usual and regular course of the storage company’s business, is quite unimportant. The significant, essential, substantial thing about this exhibit was the date of the delivery of the poultry to the Elk’s Home, and that was positively sworn to by the witness, August Beck. There can be no question about the competency of this exhibit.
The other exhibits were largely corroborative, chiefly touching the payment by the Elk’s Home to The Leonard Poultry Company for the poultry in question.
This question of “shop book entries,” as they are called, is very fully and ably discussed in 5 Encyclopaedia of Evidence, page 255:
“An entry ‘in the regular course of business’ is a record setting forth a fact or transaction made by *470 one in the ordinary and usual course of one’s business, employment, office or profession, which it was the duty of the enterer in such manner to make, or which was commonly and regularly made, or which it was convenient to make, in the conduct of the business to which such entry pertains.
“Entries made as above set out, when relevant to the issues, are admissible as original evidence, upon the conditions and subject to the limitations hereinafter set forth. Some courts treat such evidence as admissible under the res gestae rule, while others treat it as an exception to the hearsay rule, founded upon the necessity of the case, being received to obviate a failure of justice between the parties, and still another ground, that of general convenience, has been suggested.
“Whether an entry is made in the regular course of business is a question of law for the court’s determination, and such determination will not be disturbed except in very plain cases of error.”
The same work, at page 263, announces this doctrine :
“It is required, as a condition to its admissibility, that the enterer should have had, at the time, no special interest to make the entry falsely, any more than in the making of other entries similar in character; and, in general, the entry must have been made under such circumstances as to import trustworthiness and preclude the probability of its falsity.”
Now in this case, these facts and circumstances fairly and fully appeared to the trial court, but more than that, the declaration on “state’s exhibit *471 two,” showing the receipt of the goods by the cold storage company, was a declaration against its interest, which gives the entry added force for trustworthiness and truth.
The same may be said as to “state’s exhibit one,” showing the delivery of the poultry .to the Elk’s Home. It would be difficult to. conceive of the likelihood of error in the Elk’s Home declaring its receipt of the poultry in question from The Leonard Poultry Company through the storage company, when thereby the Elk’s Home' made a declaration against interest and in fact charged itself with being a debtor to The Leonard Poultry Company; and exhibits were offered showing the recognition of that debt and the discharge thereof by the Elk’s Home to The Leonard Poultry Company.
In fact, in this case, there were an unusual number of facts and circumstances not only qualifying these exhibits as competent, but rendering the possibility of error in their receipt a mere negligible quantity.
I am clearly of the opinion that the nature and necessities of the warehouse business, of which this court must take judicial knowledge, and as further shown by the record, render such exhibits clearly and conclusively competent as evidence in this case.
But, again, the testimony of Brennan touching his conversation with Leonard, made it clearly incumbent upon Leonard, if he substantially denied the truth of what Brennan said, to'take the witness-stand and challenge Brennan’s testimony that these *472 exhibits were duplicates of a record kept by the warehouse company. This he did not do, either by himself or any witness in his behalf, though other persons were present at the time of the Brennan conversation.
Formerly, under the old constitution, the failure of the defendant to testify, raised no presumption of guilt; but upon the contrary, he was presumed to be innocent. He might stand upon his silence if he saw fit to do so, and no comment could be made upon that silence, nor any inference drawn by the court or jury as to his guilt. But the new Constitution of 1912 very substantially changed these inferences. An amendment thereto made it not only proper for the prosecuting attorney to comment upon defendant’s failure to take the witness stand, but made it a proper matter for courts to consider in determining whether or not from the whole record he was legally and rightfully convicted.
We find no suggestion of error in the record, and the judgment below is therefore affirmed.

Judgment affirmed

Nichols, C. J., Matthias and Johnson, JJ., concur.
Jones, J., concurs in the judgment and in propositions 1, 2, 3, 4 and 7 of the syllabus.
Robinson, J., concurs in the judgment and in propositions 1, 2, 3 and 4 of the syllabus, but dissents from propositions 5, 6 and 7 thereof.
Merrell, J., not participating.